AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the

### Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Practice Fusion, Inc.<br>731 Market Street, Suite 400 | )<br>)<br>)<br>)<br>)<br>) |

Case No. 2: 19mj 678

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A.

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841 | Illegal Dispensing of Controlled Substances |
| 21 U.S.C. 846 | Conspiracy to Illegally Dispense Controlled Substances |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Julie Havrilla - Special Agent, DEA
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___9-4-19___

_____
*Judge's signature*

**Chelsey M. Vascura, U.S. Magistrate Judge**

City and state:  Columbus, Ohio
_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FREEDA J. FLYNN, M.D. BOARD CERTIFIED FAMILY PRACTICE THAT IS STORED AT PREMISES CONTROLLED BY PRACTICE FUSION, 731 MARKET STREET, SUITE 400, SAN FRANCISCO, CALIFORNIA 94103 | Case No. _____ **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANT FOR CLINIC OF DR. FREEDA FLYNN, M.D.

I, Julie Havrilla, being duly sworn, hereby depose and state as follows:

### IDENTITY AND EXPERIENCE OF AFFIANT

1.      Your Affiant is a Special Agent of the Drug Enforcement Administration (DEA) assigned to the Detroit Field Division, Columbus District Office. As such, your Affiant is an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516. Your Affiant has been employed by the DEA since October 2017. Your Affiant is empowered to investigate crimes, to make arrests with or without warrants, and to execute search warrants under the authority of 21 U.S.C. § 878.

2.      Your Affiant graduated from the DEA Academy located in Quantico, Virginia where she received approximately 20 weeks of specialized narcotics related training. The training included controlled substances identification, narcotics related investigative techniques, interview and interrogation training, preparation of search warrants, tactical application of narcotics

enforcement, surveillance and electronic monitoring techniques, and various forensic subjects including latent fingerprint collection and analysis.

3.     As a DEA Special Agent, your Affiant has had experience in debriefing defendants, interviewing witnesses, directing cooperating individuals, and interacting with other persons who have personal knowledge and experience regarding the amassing, spending, conversion, transportation, distribution, and concealment of records and proceeds of trafficking in controlled substances.

4.     Your Affiant has been a DEA Special Agent in the Columbus District Office for over a year and is presently assigned to the Tactical Diversion Squad (TDS), which assists in the preventions, detection, and investigation of the diversion of controlled pharmaceuticals and listed chemicals from legitimate sources. Your Affiant has participated in both criminal and diversion investigations. Your Affiant has participated in the execution of numerous search warrants at the residences and businesses of narcotics traffickers, safe houses, and crack houses, and has participated in numerous arrests for drug related offenses. Your Affiant has participated in investigations targeting individuals and organizations trafficking heroin, cocaine, cocaine base ("crack"), marijuana, methamphetamine, and other controlled substances as defined in 21 U.S.C.§ 801.

5.     Your Affiant has experience investigating individuals and organizations that illegally distribute and dispense controlled substances under the guise of operating seemingly legitimate medical clinics, colloquially known as "pill mills." These "pill mills" often operate as pain management clinics or general medical practices. Typically, an individual who seeks to abuse or illegally divert controlled substances will go to one of these medical clinics. By necessity, all "pill mills" employ medical practitioners, often physicians, who are licensed by the

DEA to prescribe controlled substances. The physician at the medical clinic issues a prescription for a controlled substance, often without performing the minimal, professionally required medical assessment of the patient's complaints, and/or without properly evaluating whether prescribing or dispensing the controlled substances is medically appropriate. As a result, these "pill mills" attract large numbers of individuals, some of whom travel long distances seeking prescriptions from these physicians. Additionally, it is not unusual in these investigations for the owners, staff, and physicians at "pill mills" to refer patients to particular pharmacies that are known to fill illegitimate prescriptions for controlled substances.

6.　　The facts and information contained herein are based on your Affiant's personal knowledge and experience, and that of other law enforcement personnel and regulatory agency investigators to include personnel from the State Medical Board of Ohio and the State of Ohio Board of Pharmacy, and review of governmental records.

## PURPOSE OF THE AFFIDAVIT

7.　　I make this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to seize information associated with a certain account relating to Freeda Flynn, M.D. (**FLYNN**) that is stored at premises owned, maintained, controlled, or operated by Practice Fusion, a cloud-based electronic health records (EHR) provider headquartered at 731 Market Street, Suite 400, San Francisco, CA 94103 (**PRACTICE FUSION**). This Affidavit is made in support of an application under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require **PRACTICE FUSION** to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

8. Through this search warrant your Affiant seeks to evidence, instrumentalities, and fruits of violations of certain federal crimes, including Title 21 U.S.C. § 841 (Distribution of Controlled Substances) and Title 21 U.S.C. § 846 (Conspiracy to Distribute Controlled Substances) (the **SUBJECT OFFENSES**), as further described in the following paragraphs and particularly in Attachment B, and to seize evidence of criminal conduct of **FLYNN**, and other co-conspirators, known and unknown.

9. Specifically, the purpose of this warrant is to seize any EHR relating to the patient files and prescriptions for the identified 26 patients treated by **FLYNN** from at least 2013 to present, as well as evidence, fruits, and instrumentalities of the **SUBJECT OFFENSES** as outlined below.

10. Because this Affidavit is submitted for the limited purpose of securing authorization for a search and seizure warrant, I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, instrumentalities, and fruits of the **SUBJECT OFFENSES** will be maintained, possessed, and controlled by **PRACTICE FUSION**.

## BACKGROUND

11. **FLYNN** holds a license to practice medicine in Ohio, License No. 35.066409, with National Provider Identifier number of 1740246107. **FLYNN**'s address of record is the **SUBJECT PREMISES**, under the operational name of "Freeda J. Flynn, M.D. Board Certified Family Practice." **FLYNN** is the only practicing doctor at her practice, which is located at 67609 Warnock Street, St. Clairsville, Ohio 43950 (**FLYNN'S PRACTICE**). **FLYNN** attended University of Louisville School of Medicine, and completed her residency at Wheeling Hospital in Wheeling, West Virginia. **FLYNN's** Ohio medical license was issued on March 4, 1994, and expires January 1, 2021. **FLYNN**'s medical license has been in probationary status since May 27,

2015, although she is still able to practice medicine. **FLYNN** maintained an active DEA registration number BF4011831 that was issued on May 27, 1994 and set to expire September 30, 2020. **FLYNN** voluntarily surrendered her license during an interview with Drug Enforcement Administration Diversion Investigator William Crawford on August 1, 2019. This license allows her to prescribe controlled substances within the bounds of a legitimate medical practice pursuant to the Controlled Substances Act, Title 21 U.S.C. § 801 *et. seq*. **FLYNN** first received approval to prescribe DATA-waived authorization to prescribe controlled substances for the treatment of narcotic addiction October 25, 2005. This authorization will be fully outlined in Paragraph 22 below.

12.     **FLYNN** is the registered owner of the structure located at **FLYNN'S PRACTICE**, which is listed in Belmont County, Ohio Auditor property records as being coded for "medical clinics and offices." **FLYNN** purports to practice family medical care at this location, which your Affiant confirmed through the Ohio Board of Pharmacy and State Medical Board of Ohio ("Medical Board") based on prior meetings at the facility.

13.     Your Affiant served a search warrant on **FLYNN'S PRACTICE** on August 1, 2019. During this search your Affiant seized physical evidence similar to that outlined in this Affidavit (incorporating Attachment B and Exhibit 1).

14.     In preparing for that search warrant, your Affiant learned that **FLYNN** uses **PRACTICE FUSION** as her EHR provider.

15.     Your Affiant then served a Grand Jury subpoena on Jim Harwood, Esq., Counsel for **PRACTICE FUSION** seeking to confirm this information. Attorney Harwood responded by confirming that **FLYNN** does maintain two active EHR accounts with **PRACTICE FUSION**.

## A.    CONTROLLED SUBSTANCES ACT, GOVERNING REGULATIONS

16.    The Controlled Substances Act (CSA) governs the manufacture, distribution, and dispensing of controlled substances in the United States. *See 21* U.S.C. § 801 *et seq*. It is a federal offense for any person to knowingly or intentionally distribute or dispense a controlled substance except as authorization by law. *See* 21 U.S.C. § 841(a)(1) (§ 841(a)(1)). It is similarly a federal offense to conspire to violate § 841(a)(1). *See* 21 U.S.C. § 846 (§ 846). The DEA was established in 1973 to serve as the primary federal agency responsible for the enforcement of the Controlled Substances Act.

17.    Title 21 U.S.C. § 812 establishes schedules for controlled substances that present a potential for abuse and the likelihood that abuse of the drug could lead to physical or psychological dependence on it. Such controlled substances are listed in Schedule I through Schedule V, depending on the level of potential for abuse, the current medical use, and the level of possible physical dependence. Controlled Substance Pharmaceuticals are listed as controlled substances, from Schedule II through V, because they are also considered drugs for which there is a substantial potential for abuse and addiction.

18.    Legitimate transactions involving pharmaceutical controlled substances take place within a "closed system" of distribution established by Congress. Under the "closed system," Title 21 of the United States Code requires that all legitimate handlers of controlled substances (including manufacturers, distributors, physicians, pharmacies, and researchers) to be registered with the DEA and maintain strict accounting for all distribution.

19.    Legitimate distributions of controlled substances are limited by the scope of each type of registration. Title 21 U.S.C. § 802(21) defines a "Practitioner" to include physicians and other medical professionals licensed, registered, or otherwise permitted by the United States or

the jurisdiction in which he practices or does research to distribute, dispense, conduct research with respect to, administer, or use in teaching or chemical analysis, a controlled substance in the course of professional practice or research.

20.    Medical professionals, including physicians, must become registered with the Attorney General to be authorized under the CSA to write prescriptions for, or to otherwise distribute or dispense, controlled substances, as long as they comply with requirements under their registration. Title 21 U.S.C. § 822(b). Such medical professionals are then assigned a registration number with the DEA.

21.    To comply with the terms of their registration, medical professionals cannot issue a prescription for a controlled substance unless it is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. 1306.04(a). Section 1306.04(a) provides that:

> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of Section 309 of the Controlled Substances Act (Title 21, United States Code, Section 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions relating to controlled substances.

22.    Likewise, under Ohio Administrative Code Section 4729-5-30(A), "[a] prescription, to be valid, must be issued for a legitimate medical purpose by an individual prescriber acting in the usual course of the prescriber's professional practice." An order issued

outside the course of legitimate practice "is not a prescription and the person knowingly dispensing such a purported prescription, shall be subject to the penalties of law." *Id.*

23.    Dosage in one or multiple concurrently-prescribed opioid is measured through Morphine Milligram Equivalents (MME). MME measures a patient's daily dosage of opioids based upon a conversion factor of the strength of the opioid (using Morphine as a base of 1) and the quantity of the controlled substance prescribed per day. The United States Centers for Disease Control (CDC) have medically determined the relative strength of opioids and made the list publicly available. For example: a patient who is prescribed and ingests a single milligram of Morphine once a day will have a 1 MME over the life of the prescription. However, a patient who ingests prescribed Oxycodone (at a conversion factor of 1.5 MME) in the standard prescription of 5 milligram dose four times a day will have a 30 MME over the life of that prescription. In Ohio the calculation is called the Morphine Equivalent Dose (MED). MME and MED are the same calculations.

24.    On March 9, 2013, the State Medical Board of Ohio (Medical Board) outlined increasing concerns for long-term opioid prescribing. The Medical Board cited notification from the CDC that prescription opioid overdoses accounted for nearly 75% of the drug overdoses nationwide, and that drugs prescribed for mental health conditions (such as benzodiazepine and antipsychotic medications) were involved in over half of those deaths. As a result, the Medical Board suggested that practitioners should consider non-opioid treatment for chronic pain patients first, and to take into account the potential for patients to use the drugs non-therapeutically and/or distribute their prescribed medications. The Medical Board further directed practitioners to be vigilant to the wide-range of potential adverse effects associated with long-term opioid therapy, and noted especially that the simultaneous prescription of opioids and benzodiazepines may

increase the risk of overdose death and other potentially adverse effects. Therefore, the Medical Board concluded that practitioners should consider the prescription of 80 MEDs for longer than three continuous months to be a "trigger point" whereby they should: 1) review the treatment plan and patient response to the prescriptions, 2) assess the risk of patient addiction, and 3) determine whether a referral to an addiction specialist is appropriate.

25. The CDC subsequently published guidance on March 18, 2016, whereby it recommended that clinicians should conduct a number of risk management steps prior to prescribing opioids, including: 1) establishing treatment goals and realistic goals for pain and function with the patient, as well as discussing known risks of opioid therapy; 2) incorporating a risk management plan including drug testing, monitoring, and reassessing necessary prescribing; and 3) reviewing a patient's Prescription Drug Monitoring Program profile to determine whether the patient is receiving potentially dangerous dosages of opioids or combinations of other controlled substances from the clinician and/or any other prescriber that put the patient at high risk of overdose. The CDC also suggested that practitioners should avoid prescribing over 50 MME/day, and should carefully justify a decision to prescribe above 90 MME/day. The CDC found in studies that (non-terminal, palliative, or cancer-diagnosed) patients with consistent prescriptions higher than 90 MME/day are not any more successful in long-term pain management, and are at a 2% to 9% more likely to overdose. As such, the CDC recommends that patients at such high dosage should be tapered to lower doses as possible or referred to certified pain management specialists. Finally, the CDC recommended that practitioners should avoid concurrent prescriptions of opioid pain medications and benzodiazepines whenever possible. Concurrent opioid and benzodiazepine use was found to nearly quadruple the risk for overdose death due to the substances' shared central nervous system depressive effects.

26. On August 31, 2016, the Food and Drug Administration (FDA) issued additional notice about the danger of concurrent opioid and benzodiazepine prescribing. In this communication, the FDA notes the dangers of concurrently prescribing opioids, benzodiazepines, and other central nervous system depressants, because concurrent use of these controlled substances can result in coma and even death. The FDA – noting that opioids alone carry serious risks such as abuse, addiction, overdose, and death – also cited multiple studies confirming these findings, including one which concluded that patients are at 10 times higher risk of overdose death through concurrent use of opioids and benzodiazepines. FDA strongly warns practitioners to limit these concurrent prescriptions, and dosages and duration of each drug should be limited to the minimum possible, due to the danger of patient harm by concurrent dosages.

27. The Ohio Medical Board adopted similar requirements starting December 23, 2018. In Ohio Administrative Code § 4731-11(E), the Medical Board codified that a physician shall take into account a drug's potential for abuse and illicit redistribution before prescribing. More notably, this new regulation prohibits physicians from prescribing over 120 daily MED unless they are board-certified in pain medicine or received a written recommendation for such from a board-certified pain medicine or hospice/palliative care physician. Practitioners are ordered to refer patients who were prescribed over 120 daily MED prior to the regulatory change to a board-certified pain medicine physician for a face-to-face visit and examination and written recommendation prior to prescribing 120 or more daily MED after the effective date of the regulation. Ohio Admin. Code § 4731-11(E)(3). The same regulations mandate additional procedures by the practitioner prior to prescribing 50 MED (updated assessments, new treatment plans, etc.) and 80 MED (written pain agreements, drug screening, pill counts, etc.) to safeguard against patient opioid abuse and dependence.

28.     The Ohio Automated Rx Reporting System (OARRS) was established in 2006 and is a web-based system that collects information on all outpatient prescriptions for controlled substances that are dispensed by Ohio licensed pharmacies and prescribed or personally furnished by licensed prescribers in Ohio. The information in OARRS is available to prescribers (or their delegates) when they treat patients, pharmacists (or their delegates) when presented with prescriptions from patients and law enforcement officers and health care regulatory boards during active investigations.

29.     Beginning April 1, 2015, Ohio law established several new requirements for Ohio prescribers relating to OARRS. Specifically: (a) Before initially prescribing or personally furnishing an opioid analgesic or a benzodiazepine to a patient, the prescriber must request patient information from OARRS that covers at least the previous 12 months; (b) the prescriber must also make periodic requests for patient information from OARRS if the course of treatment continues for more than 90 days. The requests must be made at intervals not exceeding 90 days, determined according to the date the initial request was made; and (c) under the circumstances described in (a) and (b), the prescriber is required to assess the OARRS information and document in the patient record that a patient prescription history report was received and assessed.

30.     OARRS utilizes the prescription dosage calculation MED, as outlined above, and notes the MED for all prescriptions on all reports.

31.     Practitioners who seek to prescribe controlled substance in treatment for opioid dependence have additional requirements they must complete. On or about October 17, 2000, Congress passed the Drug Addiction Treatment Act (DATA) which permitted qualified physicians to treat narcotic dependence with Schedules III through V narcotic controlled substances that are approved by the Food and Drug Administration (FDA) for that indication. The

DATA waiver the requirement for obtaining a separate DEA registration as part of a narcotic treatment program (NTP) for qualified physicians who administered, dispensed, and prescribed these specific FDA approved controlled substances. Physicians registered with the Drug Enforcement Administration (DEA) as practitioners who applied and are qualified pursuant to DATA are issued a waiver (DATA Waiver) and are authorized to conduct maintenance and detoxification treatment using specifically approved schedule II, IV, or V narcotic medications. DATA Waivers are only granted to qualified physicians. Non-physicians are not permitted to obtain a DATA Waiver. Physicians undergo additional training to become a DATA Waiver provider, and are limited in the amount of patients they can treat based on SAMHSA regulatory authorization.

32.     In addition, the Substance Abuse and Mental Health Administration (SAMHSA) provided additional guidance to physicians who prescribed office based opioid treatment (OBOT). These guidelines were provided in a Treatment Improvement Protocol (TIP 40) called the "Clinical Guidelines for the Use of Buprenorphine in the Treatment of Opioid Addiction," and are publicly-available.

33.     The Medical Board has additional rules and regulations that physicians must follow when prescribing OBOT. Specifically, physicians must make the initial assessment, diagnosis of opioid dependence, and establish a treatment plan for the patient. Physicians must also ensure patients receiving OBOT are drug screened and receive counseling or other professional recovery treatment.

34.     Title 21 U.S.C. § 841(a)(1) makes it an offense for any person to knowingly and intentionally distribute or dispense a controlled substance except as authorized by law.

35.     Based on my training experience, medical records (patient files, charts, and associated information) are usually necessary in a criminal investigation to establish that the practitioner prescribed controlled substances "not for legitimate medical purposes" and "outside the bounds of professional practice." Patient files, if appropriately maintained, should contain notes about the practitioner's individualized patient diagnoses, treatment plan, risk assessment, history of reviewing OARRS and patient drug test results, and assessments of patients' progress on the current treatment and/or prescribing patterns. This information is vital to a determination whether the practitioner is prescribing to the patient for a legitimate medical purpose.

36.     Regarding the maintenance of patient files and information, Title 21 C.F.R. § 1304.04 sets forth the requirements for maintaining records and inventory. It states: "every inventory and other records [i.e., prescriptions] required to be kept under this part must be kept by the registrant and be available, for at least 2 years from the date of such inventory or records, for inspection and copying by authorized employees of the [DEA]."

37.     Ohio Revised Code Title 47 § 4731.052, entitled "Administrative Rules for Management of Chronic Pain with Controlled Substances", requires physicians who diagnose a patient with chronic pain to maintain a written record of the patient's: 1) medical history and physical examinations; 2) diagnosis of chronic pain, including signs, symptoms, and causes; 3) plan of treatment proposed, the patient's response to treatment, and any modification to the plan of treatment, including documentation that other methods of treatment have been unsuccessful, period assessment and documentation of the patient's status, progress, and possible addiction, abuse, or diversion, of the prescribed controlled substances, and notation of any adverse effects; and 4) records or reports made by another physician that was used or consulted in diagnosing or treating the patient's chronic pain.

38.     While Ohio does not have a set standard for how long practitioners are required to maintain patient records generally, Ohio Revised Code Title 29 § 2913.40(D) requires practitioners to maintain patient records for at least six years after reimbursement for a claim. Any practitioner who knowingly alters, destroys, conceals, or removes any record relied upon for reimbursement of any Medicaid claim is guilty of the criminal offense of Medicaid Fraud. Similarly, the Centers for Medicare and Medicaid Services (CMS) requires that practitioners who are paid through Medicare to maintain patient records for up to six years from the date of its creation or the date when it was last in effective, whichever is later. 45 C.F.R. § 164.316(b)(2)(i).

### B.     RELEVANT CONROLLED SUBSTANCES

#### I.     Opioids

39.     Opioids are controlled substances that vary from Schedule I to Schedule V, depending on their medical usefulness, abuse potential, safety, and drug dependence profile. Schedule I narcotics, such as heroin, have no medical use in the U.S. and are illegal to distribute, purchase, or use outside of medical research.   In addition Schedule I drugs have a very high potential for abuse and addiction. Opioids are prescribed by doctors to treat pain, suppress cough, cure diarrhea, and put people to sleep. Effects depend heavily on the dose, how it's taken, and previous exposure to the drug. Negative effects include: slowed physical activity, constriction of the pupils, flushing of the face and neck, constipation, nausea, vomiting, and slowed breathing. As the dose is increased, both the pain relief and the harmful effects become more pronounced. Some of these preparations are so potent that a single dose can be lethal to an inexperienced user. Schedule II controlled substances have a high abuse/addiction potential, yet there is a current medical use in treatment so long as the clinician practices extreme caution.  Schedule II opioids include: Oxycodone, Hydrocodone, Morphine, Methadone, and Tapentadol (Nucynta).  Schedule

IV Controlled substances have less potential for abuse/ addiction and have a current medical use. Schedule IV opioids can still be abused and include drugs such as Tramadol.

40.     Oxycodone is a generic name for Schedule II narcotic opioid. Oxycodone is also known by its brand names, including OxyContin®, Percocet®, and Roxicodone®. Oxycodone, when legally prescribed for a legitimate medical purpose, is typically used for the relief of moderate to severe pain. Oxycodone is sometimes referred to as "synthetic heroin" or "hillbilly heroin," though, and the chemical composition and addictive qualities of oxycodone are extremely similar to that of heroin. An oxycodone prescription is generally issued for a modest number of pills to be taken over a short period of time because of the potential for addiction. OxyContin® is the brand name of a time-released formulation available in several strengths between 10 mg. and 80 mg. per tablet, designed to be absorbed into the system over the course of 10 to 12 hours. It was approved for use in 1996, and by 2001, OxyContin® was the largest grossing opiate pain reliever in the United States. OxyContin was reformulated by its manufacturer in 2010 to make it more difficult to abuse, but OxyContin is still regularly abused. Percocet® and Roxicodone® are immediate release formulations of oxycodone available in 5 mg, 15 mg, and 30 mg tablets. Because of the immediate release component, the potential for overdose and death with Percocet® and Roxicodone® is exponentially higher than OxyContin® even though the tablet strength is less. Oxycodone in either formulation is highly addictive and is a commonly abused controlled substance that is regularly diverted from legitimate medical channels. Because of their brand names, OxyContin®, Percocet® and Roxicodone® will typically bring a higher street value than their generic equivalents. In Central Ohio, typical pain pill prices for the OxyContin® and other related pills will vary with strength and the level of

dealer. For example, in my investigative experience, I have learned that a 30 mg OxyContin will cost approximately $30.

41.     Hydrocodone is a generic name for a narcotic analgesic formerly classified under federal law as a Schedule III narcotic drug controlled substance. As of October 6, 2014, hydrocodone combination products are classified under federal law as a Schedule II narcotic drug controlled substance. Hydrocodone is found in medications known by the brand names Vicodin®, Norco®, and Lortab®. Hydrocodone, when legally prescribed for a legitimate medical purpose, is typically used to relieve mild to moderate pain. Accordingly, the prescription is generally for a modest number of pills to be taken over a short period of time. Hydrocodone is formulated in combinations of 5 to 10 mg. Hydrocodone can be addictive and is a commonly abused controlled substance that is diverted from legitimate medical channels. Hydrocodone typically has a street value of approximately $5 per 10 mg tablet.

42.     One milligram of Hydrocodone is the equivalent of 1 MME; one milligram of oxycodone is 1.5 MME; one milligram of oxymorphone is 3 MME; one milligram of hydromorphone is 4 MME; and one 20-milligram daily dose of methadone is 4 MME.

I.     Benzodiazepines

43.     Benzodiazepines are depressants that will put you to sleep, relieve anxiety and muscle spasms, and prevent seizures. Benzodiazepines share many of the undesirable side effects of opioids including tolerance and dependence. Individuals abuse depressants to experience euphoria. Depressants are also used with other drugs to add to the other drug's high. Unfortunately when used in combination with opioids it not only adds to the drug's high but it also increases the potential of negative side effects such as slowed breathing known as respiratory depression. Some examples are Valium® (Diazepam), Xanax® (Alprazolam), and Klonopin® (Clonazepam).

Although not a benzodiazepine and not yet a controlled substance the drug Gabapentin also enhances both the desired drug high and the undesirable side effects of opioids.

44. Alprazolam, for example, is a generic name for a Schedule IV benzodiazepine prescription drug. Alprazolam is marketed primarily under the brand name Xanax®. When used for a legitimate medical purpose, Xanax® is used to treat such conditions as anxiety, depression, and panic disorder. Alprazolam comes in .25 mg, .5 mg, 1 mg, and 2 mg strengths. The 2 mg tablets are rectangular in shape and are often referred to on the street as "bars" or "zanny bars." Alprazolam can be addictive and is a commonly abused controlled substance that is diverted from legitimate medical channels. In Ohio, alprazolam will typically cost $5 per pill at the highest dosage.

II.    Medication-Assisted Treatment Controlled Substances

45. Buprenorphine (also identified as Subutex®) and Buprenorphine with Naloxone (also identified as Suboxone®) are controlled substances approved by the FDA to be utilized to treat drug addiction under SAMHSA supervision.

46. Buprenorphine is a thebaine derivative that is legally classified as a narcotic. It is available in numerous countries for use as an analgesic (pain killer). When used as an analgesic, buprenorphine is usually given by injection, via a sublingual (under the tongue) tablet, or as a transdermal patch, and doses are relatively low usually in micrograms.    In larger doses buprenorphine is effective in treating opioid addiction.  As with any opioid, buprenorphine can be abused. The abuse potential, however, is lower in comparison with the abuse potential of other opioids. Still, abuse of buprenorphine through diversion to the injectable route has been reported internationally. Abuse of buprenorphine has been reported to occur via the sublingual and intranasal routes but primarily via diversion of sublingual tablets to the injection route.  In a study

from France, sublingual, buprenorphine-only tablets (Subutex®), marketed for the treatment of opioid addiction, were diverted to the injection route. To lower the potential for abuse, especially by injection, scientists developed a combination tablet containing buprenorphine and naloxone (Suboxone ®). When this combination tablet is dissolved under the tongue, buprenorphine's effects predominate. However, when the tablet is dissolved and injected into the bloodstream, the undesirable effects (withdrawal symptoms) of naloxone predominate. Therefore, abusers of buprenorphine seek the single entity buprenorphine tablets (Subutex®). Physicians who prescribe buprenorphine to treat opioid addiction should consider the entire treatment process, from induction through stabilization and maintenance. Induction is the process through which the physician establishes the proper dose of medication to prevent the symptoms of withdrawal yet does not over prescribe unneeded medication which can lead to diversion. The buprenorphine/naloxone combination tablet (Suboxone®) is recommended for induction, stabilization, and maintenance treatment for most patients. Patients who want to switch from long-acting opioids such as methadone to buprenorphine may be inducted on single entity buprenorphine (Subutex®) but should be switched to combination buprenorphine/naloxone (Suboxone®) as soon as possible (within 2 days). Due to the high potential for diversion, the prescribing of single entity buprenorphine (Subutex®) should be reserved for patients with Hepatitis; patients that are pregnant; or patients with an allergy to naloxone.

47.     Buprenorphine with Naloxone, also known as Suboxone, is a controlled substance used to treat narcotic (opiate) addiction. Suboxone is a Schedule III drug. Suboxone was not intended to be used as a pain medication. Buprenorphine is an opioid medication. Naloxone is a special narcotic drug that reverse the effects of other narcotic medicines, and is therefore an important addition to Buprenorphine for addiction treatment because it is less likely to be abused

or diverted. Suboxone treatment should begin under the supervision of a doctor and is intended to be part of a complete treatment plan to include counseling and psychosocial support.

48. Due to the increased risk of abuse and/or diversion with Buprenorphine/Subutex®, SAMHSA advises practitioners to restrict their prescribing of the substance to female patients that are or will potentially become pregnant, patients with a documented allergy to naloxone, and those with hepatitis or HIV.

49. SAMHSA's aforementioned TIP training program indicates that patients whom the practitioner is prescribing Medication-Assisted Treatment to wean off opioid use should receive non-opioid analgesics for pain. If those prove to be ineffective, the practitioner is authorized to discontinue buprenorphine and provide short-acting opioids, then restart MAT. SAMHSA further discourages prescribing benzodiazepines alongside MAT controlled substances due to increased chances of overdose and illicit diversion.

### Other Relevant Controlled Substances

50. Gabapentin is an unscheduled anti-epileptic drug commonly called an anticolvulsant. All brands of gabapentin are used in adults to treat neuropathic pain, and commonly cause a sense of relaxation and euphoria. Gabapentin also has common side effects including sleepiness, restlessness, and depression, though, and is considered a "potentiator" when ingested alongside opioids. Gabapentin can be abused to overdose itself, and can become exceptionally dangerous when used with opioids.

### C. CHARACTERISTICS OF ILLEGAL PAIN MANAGEMENT CLINICS OR PILL MILLS

51. I know through my training and experience at DEA, and through consultation with experts in the field, that characteristics of an illegal pain management clinics or "pill mills" that

dispense controlled substance outside the scope of professional practice and not for a legitimate medical purpose include:

    a.  the clinic accepts cash only, or accepts cash as a main method of payment;

    b.  the clinic charges patients a flat fee based upon the drugs received and not the treatment or type of physician visit;

    c.  the patients receive prescriptions for the same or similar combinations of controlled substances;

    d.  the patients receive no physical examination (or a very cursory examination) is conducted;

    e.  the doctors at the clinics pre-sign prescriptions for controlled substances;

    f.  the physician prescribes or dispenses an inordinately large quantity of controlled substances; and

    g.  the clinics are not certified or accredited under the appropriate state laws.

52.    I also know through my training and experience that "pill mills" attempt to thwart law enforcement efforts to detect illicit activities by attempting to appear to be legitimate operations. For instance, in prior investigations doctors would prescribe controlled substances without any examination whatsoever or any indication of pain on the part of the patients. Now, in response to enforcement efforts, even the most egregious doctors require at least some indication of pain, perhaps even medical records, and perform at least a cursory medical examination.

53.    Your Affiant knows through training and experience investigating cases of unlawful prescription diversion that a practitioner concurrently prescribing benzodiazepines and Schedule II opioids is frequently *not* prescribing for a legitimate medical purpose, and is

prescribing outside the usual course of professional practice for the reasons outlined above. Prescribing and issuing these two medications around the same time compounds the patient's risk of overdose and death from the prescribed drugs, by five (5) times. Moreover, there is a significant diversion risk of prescribing or issuing these drugs around the same time. A benzodiazepine serves as a "potentiator" for the opioid's euphoric effect and increases the "high" a user may obtain from opioid and is often sought for this non-legitimate medical purpose.

### D. BACKGROUND ON ELECTRONIC HEALTH RECORDS

54.     In general, an EHR is a digital version of a patient's paper medical chart, which include, inter alia, prescription information, medical services and tests provided, the medical provider rendering the services, and the billing information. Companies, such as **PRACTICE FUSION**, offer healthcare providers with access to EHR software.

55.     According to **PRACTICE FUSION**'s website, https://www.practicefusion.com, "Practice Fusion is the #1 cloud-based ambulatory EHR platform in the U.S., supporting 30,000 medical practices in delivering better care to over 5 million patients a month." Founded in 2005, **PRACTICE FUSION** reportedly maintains a cloud-based system without any software to download or hardware to manage, and provides automatic updates and charting on any connected device. **PRACTICE FUSION** advertises services such as electronic patient charting, practice management tools (including scheduling), billing modules, and electronic controlled-substance prescribing, complete with prescribing multiple medications simultaneously and "two-click prescription refills."

56.     In general, EHR providers like **PRACTICE FUSION** ask each of their subscribers to provide certain personal identifying information when registering for an account. This information can include the subscriber's full name, physical address, telephone number, email

addresses, and for paying subscribers a means and source of payment (including any credit or bank account number). Providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e. session) times and durations, the identifying information of the individual who accessed the services, the types of services utilized, the status of the account, and the method used to connect to the account.

57.     Providers such as **PRACTICE FUSION** will also normally retain records of communications with account holders/users regarding the opening and maintenance of accounts.

58.     Your Affiant has spoken with Attorney Harwood, Legal Counsel for **PRACTICE FUSION**, who confirmed that **PRACTICE FUSION** maintains all records as outlined above as part of standard operating procedure. Your Affiant sent a preservation letter to Attorney Harwood on August 12, 2019 to confirm that **PRACTICE FUSION** would maintain the information outlined in Attachments A, B, and Exhibit 1.

**PROBABLE CAUSE OF VIOLATIONS OF LAW**

59.     Probable cause exists to believe that **FLYNN**, and others associated with her medical practice have committed the **SUBJECT OFFENSES**, including prescribing medication without a legitimate medical purpose to facilitate the diversion of controlled substances outside the scope of professional practice.

60.     This investigation into **FLYNN** began in May of 2018 as part of the Pharmacy Initiative of the DEA's Operation Safe Haven, which targeted illegitimate pain management clinics, pharmacies, and physicians in this and adjacent Districts to combat the recent growth in opioid addiction.

61.     Specifically, on May 23, 2018 West Virginia DEA Diversion Investigators travelled to pharmacies in the Moundsville, West Virginia area interviewing pharmacists regarding suspicious prescribing practices. Moundsville, West Virginia is an adjacent city to St. Clairsville, OH along the Ohio River, and is approximately 21 miles from **FLYNN'S PRACTICE.**

62.     During this investigation, DEA Diversion Investigators spoke to Pharmacist 1, who was employed at Kroger Pharmacy at 1300 Lafayette Avenue, Moundsville, WV 26041. Pharmacist 1 indicated during this conversation that **FLYNN**, whom Pharmacist 1 identified as a Suboxone and pain management doctor, was prescribing in notable excess of what other area physicians prescribe. Pharmacist 1 clarified that **FLYNN** kept patients on the same medication and dosage for extended periods, prescribed "a lot" of Xanax, and did not provide diagnosis codes to support her prescriptions. Finally, Pharmacist 1 said that he/she found it odd that **FLYNN** received cash payments.

63.     An Ohio DEA Diversion Investigator, meanwhile, was conducting similar pharmacist interviews in Belmont County and nearby Jefferson County in Ohio. On May 22 and May 25, 2018, this DEA Diversion Investigator learned similar information from two different pharmacists in the areas surrounding **FLYNN**'s St. Clairsville practice, namely that **FLYNN** was believed to be overprescribing Xanax and other benzodiazepines, and was prescribing those substances alongside Suboxone or Subutex through which she was treating opioid drug addiction.

A.     **ANALYSIS OF OARRS DATA**

64.     Your Affiant reviewed OARRS data for **FLYNN** from December 17, 2013 to June 4, 2019.

65.     Your Affiant learned that **FLYNN** prescribed opioids to 600 (41%) of her patients. **FLYNN** prescribed 9,186 opioid prescriptions to those patients, or an average of 15 prescriptions per patient. Notably, in those prescriptions **FLYNN** prescribed the following opioids: 1) 295,527 Hydrocodone pills; 2) 203,046 Oxycodone pills; 3) 43,409 Morphine pills; 4) 25,842 Nucynta/tapentadol pills; and 5) 1,714 fentanyl doses.

66.     **FLYNN** prescribed 200 or more daily MME to 34 patients during this time.

67.     During the same timeframe, **FLYNN** also prescribed: 1) 555,691 Suboxone doses; 2) 78,330 Buprenorphine pills; 3) 380,785 Gabapentin pills; 3) 62,992 Alprazolam pills; 4) 124,540 Clonazepam pills; 5) 78,007 Diazepam pills; 6) 44,371 Lorazepam pills; and 7) 45,892 Zolpidem doses.

B.     **OHIO PHARMACY BOARD REVIEW**

68.     The Ohio Pharmacy Board analysis team reviewed the prescribing patterns of **FLYNN** for the time frame of October 1, 2013 through September 30, 2018.

69.     The Pharmacy Board analysis team synthesizes OARRS and other states' PDMP data for use by the Pharmacy Board in review and investigation of prescribers' conduct.

70.     In this review, the Pharmacy Board identified that from October 2013 through September 2018, **FLYNN** ranked 20th in Ohio and second in Belmont County with 10,974,237 total prescribed MME amongst possible pain management clinicians. **FLYNN** ranked second statewide in opioid doses amongst possible addiction treatment clinicians, and seventh in total MME amongst those practitioners.

71.     The Pharmacy Board also identified that the vast majority of **FLYNN**'s prescriptions were for 30 day supplies, and that she had 127 patients who received opioids and benzodiazepines in what is commonly known as a prescribing "cocktail."

## C. DIAGNOSTIC INFORMATION – MEDICARE AND MEDICAID BILLING

72.     **FLYNN** has been a Medicare and Medicaid provider since at least 2013, meaning she has been eligible to bill professional and prescription claims for beneficiaries to both programs during the relevant periods.

73.     Based on my training and experience, I have learned that Medicare is a federal health care benefit program which operates under different "parts." Part D of Medicare covers prescription drugs. Medicare, through its agents, collects and maintains records of claims submitted for prescription drugs written by a particular provider. As described above, when a prescription is filled at a pharmacy by a Medicare enrolled beneficiary, it generates a Part D claim with Medicare, billing for the prescription.

74.     Based on my training and experience, I understand that Part B of Medicare covers doctor and office visits. I understand from consolation with other health care fraud law enforcement agents that it is typical for both a Part B and Part D visit to be generated at the same time if a patient visits a doctor and is issued a prescription. The Part B portion is the bill to Medicare for the doctor visit, and the Part D, submitted by the pharmacy, is for the prescription.

75.     Based on a review of Medicare claims data, **FLYNN** had 50 patients who had Part D without corresponding Part B claims, indicating that either i) **FLYNN** did not conduct necessary office visits on those dates she prescribed controlled substances to her patients, or ii) **FLYNN** did not bill Medicare for those visits. In my training and experience, this billing discrepancy is another circumstantial indication of unlawful prescribing.

76.     From January 1, 2015 to July 2, 2019, **FLYNN** billed Medicare for nearly $800,000 in Part B and Part D claims. Some of her most common diagnoses were vague and indicative of potential unlawful prescribing, including:

a.     "Encounter for general adult medical examination with abnormal findings": 75 beneficiaries, 106 claims;

b.     "Chronic pain syndrome": 47 beneficiaries, 144 claims;

c.     "Low back pain": 40 beneficiaries, 100 claims;

d.     "Long term (current) use of opiate analgesic": 41 beneficiaries, 100 claims;

e.     "Other chronic pain": 37 beneficiaries, 77 claims;

f.     "Hypertension": 45 beneficiaries, 65 claims;

g.     "Headache": 16 beneficiaries, 31 claims.

77.     Additionally, **FLYNN** billed Medicare for 799 claims for opioid or drug dependence treatment with 59 beneficiaries.

78.     Your Affiant also obtained data for Medicare and Medicaid billing for office visits for all patients who paid for prescriptions and/or office visits through public insurance.

79.     Through that data, your Affiant was able to identify specific diagnosis codes **FLYNN** submitted in her billing for any office visit conducted the same date as her prescriptions.

80.     Your Affiant was further able to identify the diagnoses **FLYNN** provided to justify her prescriptions through OARRS, when she submitted such information with her prescription.

**D.     PATIENT LIST WITH PROBABLE CAUSE EXPLANATION**

Based on information obtained during the course of this investigation, your Affiant identified 26 patients for whom probable cause exists that FLYNN is prescribing outside the scope of professional practice and not for a legitimate medical purpose. The patients are outlined below, and will be identified in sealed Exhibit 1. In my training and experience, the identified red flags for each patient support probable cause to believe that **FLYNN** is prescribing opioids and/or other

controlled and non-controlled substances in a manner that is outside of the bounds of appropriate medical prescribing and without a legitimate medical purpose.

| Patient # | Patient Initials | Approx. Dates of Service | Probable Cause "Red Flags" |
|---|---|---|---|
| 1 | A.S. | 2/29/2016 – 7/1/2019 (Might Continue Through 8/1/2019) | Prescribing combinations of opioids and benzodiazepines, high MME (221.8 average, over 500 at times), prior doctor shopping (patient received prescriptions from over 10 practitioners over a two-year period prior to receiving prescriptions from **FLYNN**, which indicates patient was engaged in drug-seeking behavior which would give a reasonable practitioner caution in prescribing controlled substances with a risk of abuse or diversion), prolonged prescribing, prescribing opioids after opioid dependence diagnosis, prescribing opioids in same residence with patient receiving buprenorphine prescriptions; 5 early refills of buprenorphine in 2018 |
| 2 | A.G. | 4/30/2014 – 5/21/2019 (Might Continue Through 8/1/2019) | Prescribing combinations, prolonged prescribing, potential pharmacy shopping (patient filling prescriptions at multiple pharmacies, indicating a concern that pharmacists may not fill prescriptions due to a lack of appropriate medical necessity), vague diagnoses including "headache", "low back pain", etc.; over 14,000 hydrocodone and 5,000 clonazepam pills prescribed |
| 3 | A.C. | 9/8/2016 – 5/9/2019 (Might Continue Through 8/1/2019) | High MMEs (152.5 average), prescribing combinations of opioids and gabapentin, prolonged prescribing, vague and inconsistent diagnoses |
| 4 | A.B. | 5/2/2014 – 7/3/2019 (Might Continue Through 8/1/2019) | Prescribed opioids (90 MME) while living with N.B., who was undergoing drug rehabilitation prescribing and receiving opioids |
| 5 | A.W. | 10/12/2015 – 9/10/2018 | Consistent and increasing opioid prescribing over time, prescribing buprenorphine and opioids simultaneously |
| 6 | C.G. | 8/5/2014 – 7/23/2019 (Might Continue Through 8/1/2019) | Prescribing combinations including opioid, benzodiazepine, and/or muscle relaxant (known as "Holy Trinity") for approx. 2 months; continued opioid prescription after |

| | | | |
|---|---|---|---|
| | | | diagnosis of opioid dependence and buprenorphine prescriptions; inconsistent and vague diagnoses |
| 7 | C.M. | 3/26/2015 – 7/17/2019 (Might Continue Through 8/1/2019) | Prescribing combinations with opioids and potentiators; prolonged opioid prescribing; inconsistent filling dates (indicates diversion); prescribing opioids and buprenorphine simultaneously |
| 8 | D.B. | 8/5/2014 – 7/24/2019 (Might Continue Through 8/1/2019) | High MMEs (282.5 average over multiple years), and prescribed gabapentin simultaneous to high MMEs; living with D.B.2 who was also being prescribed opioids; 4 early oxycodone refills in 2018 |
| 9 | D.B.2 | 8/22/2014 – 7/15/2019 (Might Continue Through 8/1/2019) | Prescribed opioids for extended period while living with D.B., who received high MME for years |
| 10 | E.L. | 7/29/2014 – 7/16/2019 (Might Continue Through 8/1/2019) | High daily MME (approx. 240 currently), 4 early refills, one combination of opioid and benzodiazepine |
| 11 | F.I. | 7/29/2014 – 7/16/2019 (Might Continue Through 8/1/2019) | Prolonged and extensive combination prescribing of opioids and benzodiazepines, and prescribed "Holy Trinity" in early 2019 as part of that prescribing; resided with L.I. for extended period while both were prescribed substantial dosages |
| 12 | H.M. | 8/14/2014 – 7/24/2019 (Might Continue Through 8/1/2019) | High MME (155.9 average over multiple years); prescribed combinations of opioids and multiple benzodiazepines for extended period; prescribed Suboxone for opioid dependence while being prescribed opioids; repeated vague diagnoses to justify prescriptions; 7 early refills of suboxone 2015 – 2019 |
| 13 | K.B. | 6/1/2018 – 10/9/2018 | Large distance from residence (residing in Oklahoma) to prescriber over 16 prescriptions, resides with W.B. out of state |
| 14 | L.D. | 6/29/2017 – 10/22/2018 | Prescribing combinations, high MME (165.9 daily average for over a year); 7 early refills for opioids in 2017 and 2018; at least 16 combination prescriptions for opioids and benzodiazepines |
| 15 | L.I. | 7/28/2014 – 10/1/2018 | Prescribed combinations of opioids and benzodiazepines consistently for extended period of time; lived with F.I. throughout |

| | | | period when both were being prescribed large quantities of combinations; passed away 9 days after last prescription |
|---|---|---|---|
| 16 | M.S. | 7/27/2016 – 7/10/2019 (Might Continue Through 8/1/2019) | Prescribing buprenorphine and opioids, prescribing with another opioid prescribed patient in same household |
| 17 | M.T. | 8/20/2014 – 5/19/2018 | High MME (259.1 average over nearly four years) prescribing and combination opioid with benzodiazepine and/or gabapentin prescribing for extended period; passed away September of 2018 |
| 18 | M.C. | 7/29/2014 – 7/15/2019 (Might Continue Through 8/1/2019) | High MME (204.1 average) for years' worth of opioid prescriptions, and obtained over 12,000 oxycodone pills during that time; vague diagnoses and drug dependence both diagnosed as early as 2014, but opioid prescriptions ongoing; 15 early refills on oxycodone prescriptions from 2014 to 2017 |
| 19 | N.B. | 7/3/2014 – 12/10/2018 | High MME prescribing, and prescribing opioids in combination with buprenorphine, potential doctor shopping 2015-2016 |
| 20 | P.R. | 7/28/2014 – 6/14/2018 (Might Continue Through 8/1/2019) | High MME (134.4 average over extended period); consistent combination prescribing with opioids and gabapentin or benzodiazepine; vague and/or opioid dependence diagnoses |
| 21 | P.P. | 9/9/2014 – 10/12/2015 | Incredibly high MME (652 average) spanning over approximately one year; patient passed away 14 days after last prescription; prescribed combinations of opioids and benzodiazepines, and after being prescribed buprenorphine |
| 22 | R.A. | 7/28/2014 – 10/24/2017 | Prescribed combinations of opioids, tramadol and benzodiazepines, died 4 days after last prescription on 10/24/2017 |
| 23 | R.U. | 6/12/2014 – 7/24/2019 (Might Continue Through 8/1/2019) | Consistently high MME (181.8 average) over more than 4 years; opioid, buprenorphine combination prescribing twice |
| 24 | T.C. | 6/3/2014 – 7/10/2019 (Might Continue Through 8/1/2019) | High MME (217.3 average) over more than 5 years; Prescribing combinations of opioids and benzodiazepines at least 5 times from 2017 to 2018, and one concurrent |

|  |  |  | prescription of opioid and buprenorphine, and multiple with gabapentin and opioids or buprenorphine; residence is approx. 57 miles from practice; vague diagnoses |
|---|---|---|---|
| 25 | T.R. | 2/4/2014 – 7/18/2019 (Might Continue Through 8/1/2019) | Prescribing combinations of opioids and benzodiazepines consistently since at least , early morphine refills at least 17 times |
| 26 | W.B. | 3/27/2018 – 5/29/2018 | Large distance from residence to prescriber, resides with K.B. in Oklahoma while K.B. is prescribed opioids and W.B. is prescribed benzodiazepines |

## PROBABLE CAUSE THAT EVIDENCE IS MAINTAINED BY PRACTICE FUSION

81.     Your Affiant has probable cause to believe that some or all of the aforementioned patient documentation, and other evidence implicating **FLYNN** as committing the **SUBJECT OFFENSES**, are maintained by **PRACTICE FUSION**.

82.     **PRACTICE FUSION** is further described and depicted in Attachment A, which is incorporated by reference into this Affidavit.

83.     **FLYNN** uses **PRACTICE FUSION** as her EHR provider, as corroborated by statements obtained during the course of the investigation and through information obtained by **PRACTICE FUSION**.

84.     Further, the investigative team interviewed a former employee (Employee 1) of **FLYNN's**. Employee 1 left **FLYNN**'s practice on or around July 1, 2019, and had worked there for a significant period before leaving the practice. Employee 1 confirmed that **FLYNN** does utilize **PRACTICE FUSION** to save and store some of her patient files and other associated information associated with **FLYNN'S PRACTICE**.

85.     For all of the aforementioned reasons, your Affiant believes there is probable cause to believe **FLYNN** maintains patient information and other evidence as outlined in Attachment B through the EHR system maintained by **PRACTICE FUSION**.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

86.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), by using the warrant to require **PRACTICE FUSION** to disclose to the government copies of the records and other information (including the content of communications) particularly in Attachment B.

## REQUEST TO PLACE SEARCH MATERIALS UNDER SEAL

87.     With this motion, I understand that the government is requesting that the search Application and Affidavit be placed under seal. Based on my understanding of the facts in this case, such an order would be appropriate because the search relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the ongoing investigation. Based on my training and experience, there is reason to believe that notification of the existence or content of the warrant could cause the destruction of or tampering with evidence, causing the intimidation of potential witnesses, and otherwise seriously jeopardizing the investigation. Moreover, some of the evidence in this investigation is stored electronically. If alerted to the investigation, the subjects under investigation could destroy that evidence, including information saved to their personal computers and cellular telephones.

## CONCLUSION

88.     Based upon the foregoing, probable cause exists to believe that **FLYNN** is committing one or more of the **SUBJECT OFFENSES,** namely the unlawful distribution of controlled substances not for legitimate medical purposes and beyond the bounds of professional medical practice in violation of 21 U.S.C. § 841(a)(1) and/or 21 U.S.C. § 846. There is also

probable cause to believe that evidence of those **SUBJECT OFFENSES** is maintained by **PRACTICE FUSION**, as described more fully in Attachments A and B and sealed Exhibit 1.

89.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. § 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States … that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

90.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Julie Havrilla, Special Agent
Drug Enforcement Agency

Subscribed to and sworn before me
this 4st day of September, 2019.

THE HONORABLE CHELSEA M.
VASCURA
UNITED STATES MAGISTRATE JUDGE